284 So.2d 309 (1973)
Mrs. Corine MILAM
v.
GULF, MOBILE AND OHIO RAILROAD COMPANY.
No. 47183.
Supreme Court of Mississippi.
October 1, 1973.
Rehearing Denied November 12, 1973.
Maxey, Clark & Casey, Laurel, Walter M. O'Barr, Okolona, for appellant.
Gibbes, Graves, Mullins & Bullock, Laurel, for appellee.
*310 ROBERTSON, Justice:
Mrs. Corine Milam, for herself and the other heirs at law of Harold Milam, deceased, sued Gulf, Mobile & Ohio Railroad Company (GM&O) and Elliott H. Stokes in the Circuit Court of the First Judicial District of Jones County, Mississippi, for the wrongful death of her 17 year old son, Harold Milam. Stokes paid Mrs. Milam $5500.00 and she took a nonsuit as to him. She then filed an amended declaration against GM&O alone. At the close of the plaintiff's case, GM&O moved for a directed verdict, and the Court sustained the motion. Hence this appeal.
About 6 P.M., Sunday afternoon, April 16, 1967, a clear day, Harold Milam was riding as a passenger on the right front seat of the 1963, F-85, Oldsmobile owned and operated by his 19-year old brother, Wayne Milam. On the back seat were Mrs. Louise Ivey and her minor daughter Evelyn. The Milam brothers had spent the weekend in North Mississippi and were returning to Pascagoula from Okolona where they had picked up Mrs. Ivey and her daughter.
After passing through the Town of Neshoba, and on a straightaway section of Mississippi Highway No. 15, Wayne Milam, driving in a southerly direction, blew his horn when about two car lengths back of Elliott Stokes' automobile, shifted into passing gear, pulled into the left or passing lane and attempted to pass Stokes' automobile and a pickup truck immediately in front of the Stokes' car. Milam estimated that he was about 200 to 300 feet from the GM&O railroad crossing when he began his passing maneuver and was going about 50 to 60 miles per hour when he drew abreast of the Stokes car. Milam testified that at that time, without a signal of any kind, Stokes suddenly drove to the left of the center line in an attempt to pass the pickup truck in front of him. Stokes' car hit the right side of the Milam car and caused it to go out of control. Milam's car crossed the railroad tracks with the right front wheel of his car leaving skidmarks in about the middle of the left lane and the left front wheel leaving tire marks on the extreme eastern edge of the timbers flanking the rails, just outside of the paved portion of the highway. On the wrong side of the roadway and with the left wheels off of the paved portion, the Milam car proceeded southerly at about 50 miles per hour and hit the western tip of the guard rail just south of the railroad crossing signal light, which signal light was located several feet south of the railroad crossing and a few feet east of the paved portion of highway 15. The 3" x 12" guard rail broke and lodged up underneath the Milam car. The timber pinned Wayne Milam's legs to the floor and the car continued out of control until it hit a creek bank south of the railroad crossing. Harold Milam was killed instantly.
The plaintiff's theory of liability as to GM&O was that the railroad company had negligently placed the guard rail too close to the paved portion of Highway 15, that this constituted an unlawful obstruction of the highway, and that this negligence of GM&O, together with the negligence of Stokes, constituted the proximate causes of the fatal accident.
The defenses of GM&O were that the signal light and guard rail were placed in the exact location designated by the Mississippi State Highway Commission, that the Highway Commission under Mississippi law had the duty and responsibility of selecting the location, had paid the railroad for the installation of the signal light and the guardrail, and that the railroad was not guilty of any negligence, and, even if the railroad were negligent, there were not one but two efficient, independent intervening causes of the accident: (1) the negligence of Wayne Milam in illegally attempting to pass two cars within 100 feet of a railroad crossing at a speed of 50 miles per hour, and (2) the unlawful act of Elliott Stokes in attempting to pass a pickup truck within 100 feet of a railroad crossing, in pulling into the passing lane *311 without a signal of any kind, and in hitting the right side of the Milam car, causing it to go out of control on the wrong side of Highway 15, hit the guardrail from the rear, and continue on in unbroken sequence to its fatal collision with the creek bank.
Motorists do not have the unlimited right to use every foot of a highway right-of-way and the Highway Commission is under no duty to furnish broad shoulders along every stretch of highway for the use of the motoring public. The Legislature long ago very wisely placed the duty and responsibility on the State Highway Commission:
"(f) To make proper and reasonable rules, regulations and ordinances for the placing, erection, removal or relocation of telephone, telegraph or other poles; sign boards, fences, gas, water, sewage, oil or pipe lines, and other obstructions that may in the opinion of the Mississippi Highway Commission contribute to the hazard upon any of the state highways, or in any way interfere with the ordinary travel, upon such highways, or the construction, or reconstruction or maintenance thereof, and to make reasonable rules and regulations for the proper control thereof. Any violation of such rules or regulations or non-compliance with such ordinances shall constitute a misdemeanor.
"And whenever the order of the State Highway Commission shall require the removal of, or other changes in the location of telephone, telegraph or other poles, sign boards, gas, water, sewage, oil, or other pipe lines or other similar obstructions, the owners thereof shall at their own expense move or change the same to conform to the order of the said State Highway Commission. Any violation of such rules or regulations, or non-compliance with such orders shall constitute a misdemeanor;
"(g) To regulate and abandon grade crossings on any road fixed as a part of the State Highway System, and whenever the State Highway Commission, in order to avoid a grade crossing with the railroad, locates or constructs said road on one side of the railroad, or railroads, the Commission shall have power to abandon and close such grade crossing, and whenever an underpass or overhead bridge is substituted for a grade crossing, the commission shall have power to abandon such grade crossing, and any other crossing adjacent thereto. Included in the powers herein granted shall be the power to require the railroad at grade crossings, where any road of the State Highway System crosses the same, to place signal posts with lights or other warning devices at such crossings, at the expense of the railroad, and to regulate and abandon underpass or overhead bridges and where abandoned because of the construction of a new underpass or overhead bridge to close such old underpass or overhead bridge or, in its discretion, to return the same to the jurisdiction of the county board of supervisors;
......
"(k) To make proper and reasonable rules and regulations for the removal from the public rights-of-way of any form of obstruction, to cooperate in improving their appearance and to prescribe minimum clearance heights for seed conveyors, pipes, passage ways, or other structures of private or other ownership above the highways;" (Emphasis added). Section 8038, Mississippi Code 1942 Annotated (1956).
The Legislature intended to and did vest in the State Highway Commission full and general authority and supervision over all of the State highway system, and granted the Commission full power to enforce all rules and regulations promulgated by it.
The signal light and guardrail on each side of the GM&O grade crossing on State Highway 15 have been in the same location for over 30 years. Besides protecting the single black post supporting the signal *312 light, the guardrail on each side of the grade crossing also serves the useful purpose of guiding and limiting motorists to the paved portion of Highway 15 at the level grade crossing, thus keeping motorists from wrecking their automobiles on the naked steel rails extending 6 inches above the roadbed on each side of the paved highway. For the protection of motorists, the Commission itself has constructed guardrails in close proximity to the paved portion of state highways on hills to be climbed, curves to be rounded, creeks and streams to be crossed, and elevated portions of state highways to be traversed.
For the guidance of the motoring public, the Commission has numbered the state highways and has erected signs bearing the number of each state highway near the paved portion. An infinite variety of signs all in close proximity to the paved portion of state highways has been erected by the Commission itself to alert motorists to the fact that they are approaching a crossroad, winding road, hill, dangerous curve or even a deer crossing. These markers and signs would be absolutely useless if they were not placed close to the traveled portion of the highway where the driver of a motor vehicle can read and heed without taking his eyes off of the highway.
There is no evidence in the record that the Highway Commission considered this guardrail a hazard or an interference in any way with ordinary travel on the highway. § 8038(f). The plaintiff offered no rule or regulation or order of the Commission for the removal of this guardrail as an obstruction, even though the Commission was given specific authority in 1930: "To make proper and reasonable rules and regulations for the removal from the public rights-of-way of any form of obstruction, ..." Section 16, Chapter 47, General Laws of Mississippi 1930; Section 8038(k), Mississippi Code 1942.
We are of the opinion that the GM&O was not negligent in placing the signal warning lights and the guardrails near the railroad grade crossing of State Highway 15.
There is still another reason why the trial court was right in directing a verdict for the defendant at the close of plaintiff's case. There were not one, but two, efficient, independent intervening proximate causes of this tragic accident. The wrongful and illegal act of Wayne Milam, the driver of the car in which his 17 year old brother was killed, in driving at a speed of at least 50 miles per hour in a vain attempt to pass two cars within 100 feet of a railroad crossing, combined with the wrongful and illegal act of Elliott Stokes when, without warning, he drove his car to the left of the center line in an attempt to pass the pickup truck in front of him and hit the right side of the Milam car, causing it to go out of control on the wrong side of the highway and hit the guardrail from the back, thence proceed in an unbroken sequence to its fatal collision with the creek bank, were the proximate causes of the tragic accident.
Section 8185(b)2, Mississippi Code 1942 Annotated (1956) provides:
"(b) No vehicle shall, in overtaking and passing another vehicle or at any other time, be driven to the left side of the roadway under the following conditions:
......
"2. When approaching within one hundred feet of any bridge, viaduct, or tunnel or when approaching within one hundred feet of or traversing any intersection or railroad grade crossing." (Emphasis added).
Milam and Stokes both violated this law and their negligence intervened and constituted the sole proximate causes of this accident.
Elliott Stokes also violated the law requiring the giving of a signal before pulling out of a regular lane into a passing lane. Section 8192(a).
*313 Even if the railroad company were negligent, the negligence of Milam and Stokes intervened to cause the fatal accident. In Mississippi City Lines, Inc. v. Bullock, 194 Miss. 630, 13 So.2d 34 (1943), this Court said:
"Although one may be negligent, yet if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a nonactionable cause. Negligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof. .. .
"... the boy of his own volition set himself in motion, and passed rapidly down the west side of the bus and out from its rear and into the traveled highway where he was struck and killed, as already stated.
"It is obvious, therefore, that if this is not clearly a case of an intervening independent cause, it would be next to impossible to put a case where that doctrine would actually apply." (Emphasis added). 194 Miss. at 639, 640, 13 So.2d at 36, 37.
See, also, Stewart v. Kroger Grocery, 198 Miss. 371, 21 So.2d 912 (1945) and Permenter v. Milner Chevrolet Co., 229 Miss. 385, 91 So.2d 243 (1956).
In Vines v. Southwestern Mississippi Electric Power Assn., 241 Miss. 120, 129 So.2d 396 (1961), Richard Vines, a guest passenger in an automobile operated by John Parsons, was killed when the automobile in a slight curve to the left, left the traveled portion of the road and collided with a power line pole maintained by the appellee. The pole was 3 1/2 to 4 feet from the traveled portion of the highway. The impact of the collision broke the power line pole and caused the power line to fall into the road. The driver got out of the automobile first, followed by the deceased who ran from the car, went up the embankment and into the power lines. The deceased was killed almost instantly from electrocution. The trial court directed a verdict for the defendant and this Court, in affirming, said:
"The fact remains that anyone striking the pole was not lawfully and properly using the road. The evidence and the photographs clearly show that anyone making the ordinary and proper use of the highway would not strike this pole." 241 Miss. at 130, 129 So.2d at 400. (Emphasis added).
In Hoke v. W.L. Holcomb & Associates, Inc., 186 So.2d 474 (1966), this Court said:
"Therefore, appellee's negligence, if any, created a condition or occasion for Mr. Hoke and his wife to attempt to cross the public highway. Appellee had no control over this highway. Mr. Hoke received the injuries which resulted in his death while crossing the highway. Callahan, of his own volition, put in motion the independent force which led in an unbroken sequence to the injuries and death. Under these circumstances the negligence, if any, of appellee became remote. The negligence of Callahan was the proximate cause of the injuries and death." (Emphasis added). 186 So.2d at 477.
In Robison v. McDowell, 247 So.2d 686 (Miss. 1971), the operator of a tractor was proceeding in a northerly direction on a concrete bridge with the discs attached to his tractor illegally extending three to four feet into the southbound lane of the bridge. McDowell stopped his pickup truck on the right shoulder north of the bridge awaiting Robison's crossing of the bridge. Johnson, in his pickup truck, drove into the rear of McDowell's stopped truck. This Court, in *314 reversing a jury verdict for the plaintiff against Robison, said:
"The remaining question is whether the negligence of Robison was a concurring proximate cause of the plaintiff's injuries, or whether the negligence of defendant Johnson was an independent, intervening and efficient cause of the plaintiff's injuries which superseded the negligence of Robison.
......
"The cited cases hold that negligence is remote and non-actionable which merely causes a person to be at a particular place at a particular time where such person is injured as a result of the negligent act of another, who puts in motion a different and intervening cause which efficiently leads in unbroken sequence to the injury... . The requirements of the law as to foreseeability can probably be better expressed in terms of how far the responsibility of an actor extends. If the act complained of is only a remote cause, superseded by an independent, efficient intervening cause that leads in unbroken sequence to the injury, the original negligent act is not a proximate, but a remote cause. Thus, not being foreseeable, the original cause is not actionable. In our view, when measured by the settled rules of the law of negligence, Robison is not liable." (Emphasis added). 247 So.2d at 688-689.
To the same effect is Pargas of Taylorsville, Inc. v. Craft, 249 So.2d 403 (Miss. 1971).
The judgment of the circuit court in directing a verdict for the defendant, Gulf, Mobile and Ohio Railroad Company, is affirmed.
Affirmed.
GILLESPIE, C.J., and PATTERSON, INZER, SMITH and SUGG, JJ., concur.
RODGERS, P.J., and WALKER and BROOM, JJ., dissent.
RODGERS, Presiding Justice (dissenting).
I concur in Judge Walker's dissenting opinion. It appears to me that what this Court is doing in this case is simply trying the case in this Court so as to say there was an intervening cause of negligence sufficient to insulate the negligence of the railroad in building a hazardous barricade up to and near the edge of the pavement.
It has been said that "... [A]n intervening cause is material in determining legal cause only in so far as it supersedes a prior wrong as the proximate cause of an injury, by breaking the sequence between the prior wrong and the injury. Accordingly, a superseding intervening cause is one which operates, in succession to a prior wrong, as the proximate cause of an injury. If the so-called intervening cause is not a superseding cause, negligence may be actionable, notwithstanding the intervening cause contributed to the injury, upon the theory that the negligence was a concurring cause." 38 Am.Jur. Negligence § 67, at 721-22 (1941).
The agents of the railroad company certainly anticipated that people would leave the paved portion of the highway at this point, because they erected the barricade to stop vehicles which left the pavement from striking the signal device.
I think the court should have submitted the negligence issue to the jury.
WALKER, Justice (dissenting):
I must respectfully dissent from the holding of the majority. When the evidence in this case is considered most favorably to the plaintiff, which we are required to do in ruling upon defendant's motion for a directed verdict, there is no question but that the plaintiff made out a prima facie case. The established rule in Mississippi in determining whether a party is entitled to a directed verdict or a peremptory instruction is that the Court must look solely to the testimony on behalf of *315 the party against whom the directed verdict is requested and must take the testimony as absolutely true, along with all reasonable inferences which could be drawn therefrom, favorable to such party. Meaut v. Langlinais, 240 Miss. 242, 125 So.2d 866 (1961). When this rule is applied, the testimony of Wayne Milam alone is sufficient to establish a prima facie case on behalf of the plaintiff that would withstand any attack by way of a directed verdict. The pertinent parts of that testimony are as follows:
Q. All right, sir, so as you came through Neshoba I believe you had told the jury that you came up behind the car and a pickup truck. Do you remember what kind of car it was?
A. No, sir, I don't.
Q. And do you remember the approximate speed that you were at the time  well, let me ask you this: What did you then do as you got into Neshoba with reference to passing?
A. I had to slow down for the traffic in front of me. When I saw the road was clear I started to pass.
Q. All right, and at that time how many times would you say you had been across this crossing to your knowledge  that came up later?
A. I can't really say, but not more than maybe once or twice.
Q. All right, sir, and so what did you do when you started to pass then?
A. I tooted my horn.
Q. What else did you do?
A. I pulled into the left lane to pass.
Q. All right, and now just go ahead and tell the jury  let's see, how far were you when  from the  what you later found out to be the railroad crossing when you started to make this pass? In your best judgment?
A. Two or three hundred yards. I mean feet, excuse me.
Q. Two or three hundred feet?
A. Yes, sir.
Q. Now, go ahead and tell the jury what happened as you started down past this car?
A. When I pulled into the left lane to pass I got alongside of this car driven by Stokes and he pulled out, I guess to pass too, and hit my car on the right hand side, and when I saw he was coming out I hit my brakes but it was too late, he hit me and we went on down the left hand side of the road and into the railroad crossing there that was sticking out in the road there 
BY MR. GRAVES:
 we object to that, your Honor.
BY THE COURT:
Overruled.
BY MR. CASEY:
Q. What was sticking out into the road?
A. It was a bannister  a railroad bannister or barricade. I wouldn't know how to describe it. There was a piece of timber  three posts supported it  and this  it looked like to me about a four by twelve, and it could have been a little smaller or a little larger, I don't know, and it came through the car right behind the front tire and it knocked the  it locked the steering on the car and you couldn't steer it, and it pinned my legs to the accelerator, and when I started to pass this car I put it in second gear to pick up speed enough to pass the car, and it had my legs pinned to the accelerator and there was nothing I could do to control the car after that. And we went from there on into a creek and hit the bank on the bank of the creek.
Q. All right, sir. Now, prior to the time that you hit this barricade and immediately *316 after the Stokes car bumped you, on your right side  Was it your right side?
A.  yes, sir.
Q. What did you do with reference to the operation of the car?
A. I tried to keep it under control and trying to keep it there in the left hand lane as best I could, and I had it under control until that timber came through the car.
Q. All right, sir, now do you recall the  approximately how close to the paved portion of the road that timber protruded?
A. Well, it looked like to me it was inches in the pavement, and there just wasn't room enough to get by it.
He was later asked this question:
Q. All right, from the best of your recollection would you state how far the timber, if it extended any beyond this post, how far it extended?
BY MR. GRAVES:
Objection.
BY THE COURT:
He 
BY MR. GRAVES:
 the witness said he wasn't familiar with the crossing and he was in a passing situation and didn't have an opportunity to make such an observation.
BY THE COURT:
Overruled.
A. The timber in my best judgment looked like it was in the edge of the pavement.
He later testified while being examined with reference to a picture in evidence and in response to a question about the location of the barricade that "To the best of my ability the barricade looked like it was in the edge of the road here. (Indicating). Q. When you say `road' what part of the road? A. The paved portion of the road.
The above testimony when considered and weighed in a light most favorable to the plaintiff and in conformity to the above rule shows: (1) the driver of the Milam car was lawfully attempting to and could have completed passing the Stokes' vehicle when more than 100 feet from the railroad crossing; (2) that he was forced from the highway while lawfully using said highway; (3) that he had his automobile under lawful control when he collided with the railroad guardrail; (4) that the guardrail was so negligently constructed by the defendant that it protruded into the paved travelled portion of the highway; and (5) that the negligence of Stokes in pulling out of his lane of traffic and colliding with the Milam automobile was a concurring contributing proximate cause of the death of Harold Milam and not such an efficient intervening cause as to relieve the defendant railroad from liability.
The above testimony makes a jury issue on the questions of negligence, foreseeability and proximate cause.
This Court has held in a long line of cases that even where the evidence is such that a judgment for the adverse party would have to be set aside as being contrary to the overwhelming weight of the evidence, it does not necessarily follow that a party is entitled to a directed verdict. Buntyn v. Robinson, 233 Miss. 360, 102 So.2d 126 (1958).
In my opinion, the lower court erred in granting defendant's motion for a directed verdict and this case should be reversed and remanded for a new trial.
RODGERS, P.J., and BROOM, J., join in this dissent.